UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

RAQUEL DOWNING,

               *Plaintiff,*

     – against –

PRAGYA YADAV, WEILL CORNELL
MEDICINE,

               *Defendants.*

**MEMORANDUM & ORDER**
24-cv-04739 (NCM) (MMH)

---

**NATASHA C. MERLE**, United States District Judge:

Plaintiff Raquel Downing, proceeding pro se, sues her former employer, defendant Weill Cornell Medicine ("Weill Cornell"), and her former supervisor, defendant Pragya Yadav. Am. Compl. ("AC") 1, ECF No. 23.[1] Plaintiff alleges that her treatment at work, culminating in her termination, constituted discrimination based on her race, sex, and age. *See generally* AC. Plaintiff also alleges that defendants retaliated against her for complaints she raised about her treatment. *See generally* AC. She also brings claims for defamation, intentional infliction of emotional distress, and violation of Food and Drug Administration ("FDA") regulations concerning clinical trials. AC ¶¶ 34–36, 40–42.[2] Before the Court is defendants' motion to dismiss the complaint pursuant to Rule 12(b)(6)

---

[1]     Throughout this Order, page numbers for docket filings refer to the page numbers assigned in ECF filing headers.

[2]     Plaintiff previously raised claims for discrimination and retaliation on the basis of her disability, but has voluntarily dismissed these claims. *See* Letter re: Late Filing and Voluntary Dismissal of Disability-Based Claims ("Dismissal Letter"), ECF No. 46.

and 12(b)(1) of the Federal Rules of Civil Procedure. *See* Mot 7.[3] For the reasons discussed below, defendants' motion is **GRANTED** in part and **DENIED** in part.

## BACKGROUND

For purposes of assessing defendants' motion to dismiss, the Court presumes the truth of the non-conclusory factual allegations in plaintiff's amended complaint.

Plaintiff is a clinical researcher who was formerly employed by defendant Weill Cornell. AC ¶¶ 1–2. Defendant Yadav was plaintiff's supervisor. *See, e.g.*, AC ¶¶ 14, 16; *see also* Mot. 9 (referring to plaintiff's "supervisor, defendant Dr. Pragya Yadav"). At Weill Cornell, plaintiff managed over 20 oncology clinical trials, ensuring compliance with FDA regulations and New York State protocols. AC ¶ 2. Plaintiff is African American and female. AC ¶¶ 1, 7.

### I.    September 2023: Junior Employee's Assignment to Different Building

In September 2023, Yadav returned from a vacation and alleged that at some point in the recent past, a junior employee named "Lhaden" had said to another employee named "Sharanya C." that Lhaden did not want to work with plaintiff. AC ¶¶ 3, 15. The amended complaint does not specify Sharanya C.'s official title or role, but it appears that she worked in a human resources or supervisory capacity. *See, e.g.*, AC ¶¶ 13, 16. The amended complaint implies that Sharanya C. was out of the office at the same time that Yadav had been on vacation. AC ¶ 3. As a result of Lhaden's statements to Sharanya C., Lhaden was assigned to work in a different work building, known as the "DHK Medical Building," until Yadav and Sharanya C. returned to work. AC ¶¶ 3, 15. Plaintiff was

---

[3]    The Court hereinafter refers to the Memorandum of Law in Support of Defendants' Motion to Dismiss, ECF No. 33-1, as the "Motion"; plaintiff's Memorandum of Law in Opposition to Defendants' Motion to Dismiss, ECF No. 36, as the "Opposition"; and defendants' Reply, ECF No. 37, as the "Reply."

informed that Lhaden's reassignment was intended to provide Lhaden with hands-on patient experience. AC ¶¶ 3, 15. These events led plaintiff to feel isolated and discriminated against. AC ¶ 3.

II.     September 14, 2023: Yadav's Directive to Violate FDA & Hospital Protocols

On September 14, 2023, Yadav directed clinical staff to violate FDA and hospital protocols by storing clinical trial specimens in a standard medication refrigerator rather than in a specialized laboratory refrigerator maintained at a specific temperature. AC ¶ 5. Yadav subsequently attempted to shift blame for the resulting error onto plaintiff. AC ¶ 5. Plaintiff alleges that this incident would go on to be "a key factor leading to escalating discriminatory treatment." AC ¶ 5.

III.    September 28, 2023: Yadav's Recorded Remarks about Plaintiff

A.     Allegations in the Amended Complaint

Plaintiff alleges that on September 28, 2023, Yadav made discriminatory remarks directed at plaintiff in the presence of staff. AC ¶ 15. Plaintiff references an audio recording on which she alleges that Yadav can be heard stating, with respect to plaintiff, "'[l]ook at her . . . who wants to work with her?' while attempting to persuade junior employee Lhaden to echo these sentiments to Sharanya C." AC ¶ 15 (ellipses in original). Plaintiff also asserts that Yadav "declared her intent to involve others, including Sharanya C., Shelia P., and Sandy B., to isolate and target [p]laintiff." AC ¶ 17. The amended complaint does not specify the specific title of role of Shelia P. or Sandy B., but it appears that Sandy B. worked in an HR capacity and Shelia P. in either an HR or "administrator" capacity. AC ¶¶ 9, 16. Plaintiff further asserts that at another point in the recorded meeting, Yadav informed Sharanya C. that Yadav would no longer work with plaintiff and would be stationed at a different building. AC ¶ 17. Plaintiff says that "Yadav explicitly stated that she would not

3

work with [p]laintiff, declaring, 'I am going to work across the street at DHK; I am not going to work with her because she is going to be in a lawsuit.'" AC ¶ 18. Plaintiff alleges that "[t]hese actions and comments are clearly discriminatory and racist, as [d]efendant Yadav continued to work with other employees who were not African American, thereby ostracizing [p]laintiff due to racial discrimination and creating a hostile work environment." AC ¶ 17. Plaintiff also asserts that "Yadav was aware that her actions violated federal . . . [and state] anti-discrimination laws." AC ¶ 18.

B.     Audio Recording Attached to Amended Complaint

Plaintiff attaches an audio recording as an exhibit to her amended complaint, *see* AC 22, and the Court finds it appropriate to consider the contents of this recording while resolving the instant motion. Typically, "on a motion to dismiss, the court may only consider information contained within the four corners of the complaint." *U.S. Bank N.A. v. Bank of Am., N.A.*, No. 12-cv-04873, 2012 WL 6136017, at *2 (S.D.N.Y. Dec. 11, 2012). However, "a court may consider documents attached to the complaint as an exhibit or incorporated in it by reference." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002). Plaintiff's amended complaint explicitly references "Exhibit 3" of her original complaint, *see* AC 22, which is an audio recording dated September 28, 2023 that plaintiff provided via URL, *see* Compl. 34, ECF No. 1. Defendants have submitted a transcription of this audio recording produced by a certified court reporter, *see* Transcript of Recording ("Transcript"), ECF No. 33-3. The Court will use citations to the transcript for ease of reference.

The recording opens with Yadav complaining to Lhaden about plaintiff's performance at work. Tr. 3. Yadav laments that plaintiff "cannot randomize a patient, which is a friggin' five minute job." Tr. 3. Yadav then begins interspersing her critiques of

4

plaintiff's work performance with statements about (1) Yadav's frustrations that plaintiff is asking for more work while not doing a satisfactory job at the work she has been assigned; and (2) Yadav's concerns that plaintiff is accusing other employees of harassment and is building a legal case. Yadav states to Lhaden, "[b]ut do you even understand she's building a court case with this, a legal case with this? 'And I am not given enough work. You are favoring other employees.' Do you see where this is going?" Tr. 4. Yadav then states "She's trouble. . . . I think she's trouble." Tr. 4. Yadav seemingly explains that she takes issue with plaintiff's requests for more work because in Yadav's opinion, plaintiff is "not even good with basic, basic, basic work." Tr. 4. Yadav then states that plaintiff is "bringing in the other employees. She's bringing in a case of harassment and . . . [s]he was not even good at anything." Tr. 4. Yadav then expresses that plaintiff is "putting the blame on me, that I tricked her in some way" but insists "[h]ow am I tricking anyone with anything here? . . . [A] research assistant can do this job." Tr. 5. Yadav then states "What is bothering me is not incompetence. What is bothering me is the litigation and the legal things that she's bringing here. . . . And I mean, Lhaden, I've worked very hard to be where I am. I do not want to get drawn into something, like, so bad." Tr. 5.

Later on in the conversation, Yadav remarks that "[s]he's just trying to create this whole story." Tr. 11. Yadav soon after asks rhetorically, "but what is the discrimination here?" Tr. 11–12. Yadav then states, "[w]e hired you even after knowing who you are, right? We hired you. We want to give you a chance. . . . And look at her attitude -- and look at her attitude. . . . How will I work with her?" Tr. 12.

The conversation then briefly turns to the age of the three individuals. Lhaden states "I thought she (inaudible) age difference between us or I thought she was (inaudible), but she has a lot of feelings about (inaudible), you know." Tr. 12. Yadav

responds "[b]ut you have to, like, (inaudible), right? . . . When I came to clinical research, I was a little bit older, because I completed my Ph.D[.] and stuff like that." Tr. 12. Lhaden then replies, "Yes -- no, I mean, you were treated differently, because of --," Yadav then cuts in, "Yes. You and me are very easily, I think, even 20 years apart. . . . I know that, you know, the world is a bigger place You put yourself into perspective into where you are. . . . And I have said this to everyone (inaudible). I am here to get the work done and just go home. That is it I have no -- like, I am not getting anything out of this place . . . . Like, I just get my paycheck. I perform my job responsibilities. I go home." Tr. 13.

Eventually, Yadav and Lhaden begin conversing with Sharayna C., for what appears to be a scheduled session for plaintiff and Yadav to talk to Sharayna C. about issues that plaintiff and Yadav are having with one another. *See* Tr. 15–16. At this point, it appears that plaintiff is not yet part of the conversation, at least as far as Yadav and Sharayna C. are aware. *See* Tr. 15–16. Yadav explains to Sharayna C. that another person "just stepped out, Sharanya, but I want her to be here, so that we all -- all of us can -- like, I can say my point and she can say her point, but whatever has happened, I feel extremely threatened, and I do not want to sit with her in the same office any more. And after talking to you, I'm going to sit in DHK for the rest of the day." Tr. 16. A few minutes later, plaintiff seemingly joins the conversation, Tr. 17, and the conversation turns into a meeting where plaintiff and Yadav are discussing their workplace issues with one another and presenting their various grievances to Sharayna C. Tr. 19–39. After some time, Yadav returns to the topic of going to the DHK building. Tr. 38–39. Yadav states: "So Sharanya, I think you've heard both sides of the argument, and I -- I think that I have been trying above and beyond to provide (inaudible) instruction and help her, you know, transition along and settle into her role, but based on the events that happened Tuesday morning and also the discussion here,

6

I'm extremely uncomfortable. I just don't feel that we are operating in good faith, here. I feel extremely uncomfortable, you know, giving her instructions going forward. And I don't know how to, you know, like, deal with the situation. For now, I would prefer to go sit in DHK, and I will work from there for the rest of the day." Tr. 38–39.

IV.    October 3, 2023 Benchmark Meeting

On October 3, 2023, without prior notice or preparation, plaintiff was abruptly summoned into a last-minute, unscheduled "benchmark meeting" with Yadav, Sharanya C., and Shelia P. AC ¶ 4. Plaintiff alleges that the meeting "was not a legitimate performance review but was orchestrated solely as a harassment session." AC ¶ 4. According to plaintiff, during this meeting, "Yadav tampered with [p]laintiff's work records, made unfounded remarks regarding her reputation by falsely asserting that 'people are talking about' her, and compelled [p]laintiff to photograph her work to prove its completion." AC ¶ 4. Plaintiff alleges that this "unscheduled, baseless meeting[] violated federal [and state] anti-discrimination protections . . . , contributing to a hostile work environment." AC ¶ 4. During the meeting, the September 14, 2023 incident involving specimens being improperly stored was highlighted as part of an attempt to ridicule and blame plaintiff for an error caused by Yadav. AC ¶ 5. Plaintiff alleges that this "further evidence[es] the meeting's intent as harassment rather than a legitimate review." AC ¶ 5.

At some point—either during the October 3, 2023 meeting or on a different occasion—Yadav falsely alleged that plaintiff accepted her position solely for healthcare benefits and inappropriately inquired into personal details about plaintiff, such as the age of plaintiff's son. AC ¶ 6. Plaintiff alleges that these actions were an invasion of her privacy and violated both HIPAA regulations and Weill Cornell's internal confidentiality policies.

AC ¶ 6. Plaintiff additionally alleges that these actions "further exemplif[y] the pattern of discriminatory and intrusive behavior directed at" her. AC ¶ 6.

V.    Meetings that Excluded Plaintiff

At an unspecified time, plaintiff discovered that secret meetings were held at the office as soon as she left for lunch. AC ¶ 7. These meetings were attended by Yadav, Sharanya C., Lhaden, and an individual named Dr. Nagar who worked as a sub-investigator. AC ¶ 7. Plaintiff alleges that these meetings "included only the Asian members of the clinical trial team along with Dr. Nagar." AC ¶ 7. These meetings were deliberately conducted without plaintiff's participation. AC ¶ 7. Plaintiff alleges that her "exclusion was a discriminatory and racist practice against [p]laintiff, an African American, as she was the key person in the clinical trials department but was omitted from meetings that included only the Asian members of the clinical trial team along with Dr. Nagar." AC ¶ 7. Yadav routinely monitored plaintiff's lunch breaks and whereabouts by asking intrusive questions about whether she was in the lounge, library, or outside in order to arrange these secret meetings while plaintiff was out. AC ¶ 7. Upon plaintiff's return to the office, these meetings would immediately cease. AC ¶ 7. Plaintiff alleges that her exclusion from these meetings "prejudice[ed] [her] in the workplace among the team staff." AC ¶ 7.

VI.    Issues Related to Dr. Nagar

At another unspecified time, plaintiff was auditing a study conducted by Dr. Nagar and found numerous problems in the study's records. AC ¶ 8. Plaintiff was instructed to update these records even though the issues had existed for several years before plaintiff's employment began. AC ¶ 8. Plaintiff explains that this was "a significant breach of protocol" and that "[t]his situation falsely implicated [p]laintiff in the oversight." AC ¶ 8.

8

Plaintiff alleges that Yadav repeatedly raised concerns about patients of Dr. Nagar, while no similar issues were reported for other physicians in the department. AC ¶ 11. Plaintiff alleges that she "experienced direct racial discrimination in connection with Dr. Nagar's cases, resulting in intensified harassment such as critical emails about her work performance, unscheduled prolonged meetings, and coerced participation in recorded Zoom calls intended to intimidate her." AC ¶ 11.

VII.    Plaintiff's Complaint Email and the October 4, 2023 Response

At some unspecified time around October 4, 2023, plaintiff submitted a complaint by email to an unspecified recipient. AC ¶ 13. On October 4, 2023, the Chairman of Radiation Oncology, Dr. Formenti, responded to plaintiff's complaint email by directing her to report the matter to the Office of Institutional Equity. AC ¶ 13. Plaintiff did so. AC ¶ 13. However, plaintiff alleges that she continued to face retaliation. AC ¶ 13.

Plaintiff alleges that "[d]espite [her] strict adherence to Weill Cornell Medicine's established protocols for reporting discriminatory behavior, she was subjected to retaliatory actions, further exacerbating the hostile work environment." AC ¶ 11. Plaintiff does not make clear whether her reference to her "strict adherence to Weill Cornell Medicine's established protocols for reporting discriminatory behavior" was a reference to the complaint she submitted by email or to something else. AC ¶ 11.

VIII.    Dr. Formenti's Remark About How Long Plaintiff Would Last

At an unspecified time prior to October 12, 2023, Dr. Formenti made a remark during a staff Zoom meeting. AC ¶ 13. Specifically, Dr. Formenti chuckled and questioned how long plaintiff would last, referencing the department's high turnover rate. AC ¶ 13. Plaintiff alleges that an individual named Marvin C. has stated that "former employees, such as Dr. Charles from Nigeria, abruptly left due to unfair treatment, work without pay,

9

and mistreatment related to their visa status." AC ¶ 13. Plaintiff explains that "most employees in this department were international, with [p]laintiff, an African American, being an exception." AC ¶ 13.

IX.    October 12, 2023 Reversal of Leave Approval

One incident that plaintiff alleges constitutes retaliation occurred on October 12, 2023. AC ¶ 13. Sharanya C. had approved letting plaintiff take the day off for a medical procedure but reversed her decision via email after plaintiff had already departed for the procedure "citing probationary concerns despite knowing the procedure was medically scheduled." AC ¶ 13.

X.    Plaintiff's Cumulative Allegations

Plaintiff alleges that over time, she "endured a cumulative pattern of discriminatory and retaliatory actions. She was repeatedly harassed, yelled at, singled out, and targeted; frequently summoned to unscheduled meetings for unwarranted discipline; and assigned tedious, non-job-related clerical tasks that were not imposed on similarly situated non-African American employees." AC ¶ 10. In particular, plaintiff contrasts her treatment with the treatment of Lhaden, who plaintiff suggests is Asian. AC ¶ 7. Plaintiff explains that Lhaden was specifically trained to perform many of the functions for which plaintiff was hired but was not subjected to such treatment. AC ¶ 10.

XI.    November 2, 2023 Meeting with Human Resources

Plaintiff alleges that Yadav repeatedly summoned plaintiff into meetings without a legitimate business basis. AC ¶ 16. For instance, on November 2, 2023, plaintiff was called into a meeting with Human Resources, including Sharanya C., Shelia P., and Sandy B. AC ¶ 16. At the meeting, plaintiff's work performance was harshly criticized and she was berated. AC ¶ 16. Plaintiff alleges that "[t]hese unscheduled, baseless meetings were used

10

solely to intimidate and isolate [p]laintiff, creating a pattern of manipulation intended to terminate her employment." AC ¶ 16.

XII.   Plaintiff's Medical Leave, The Instant Lawsuit, and Plaintiff's Termination

At some point, plaintiff went on medically approved leave due to documented medical conditions. AC ¶ 12. On July 8, 2024, while plaintiff was still employed by Weill Cornell, plaintiff initiated the instant lawsuit. *See* Compl. On August 8, 2024, Weill Cornell terminated plaintiff's employment. AC ¶ 18.

On February 26, 2025, plaintiff filed an amended complaint in the instant case. *See* AC. The amended complaint raises claims for discrimination on the basis of race, age, sex, and disability, fostering a hostile work environment, and engaging in retaliation in violation of Title VII of the Civil Rights Act, the Age Discrimination in Employment Act, the Americans with Disabilities Act, the NYSHRL, and the NYCHRL. AC ¶¶ 21–23; 28–33; 37–39. The amended complaint also alleges failure to provide reasonable accommodations for plaintiff's medical conditions, AC ¶¶ 24–27, defamation, AC ¶¶ 34–36, intentional infliction of emotional distress, AC ¶¶ 34–36, and failure to comply with FDA regulations for scientific integrity and patient safety in clinical trials, AC ¶¶ 40–42. On February 19, 2026, plaintiff voluntarily dismissed her federal and state claims of discrimination and retaliation based on disability. *See* Dismissal Letter. Before the Court is defendants' motion to dismiss the amended complaint. *See* Mot.

**LEGAL STANDARD**

When deciding a motion to dismiss, a district court must "accept[] all factual claims in the complaint as true, and draw[] all reasonable inferences in the plaintiff's favor." *Lotes Co. v. Hon Hai Precision Indus. Co.*, 753 F.3d 395, 403 (2d Cir. 2014). "The issue" on a motion to dismiss "is not whether a plaintiff will ultimately prevail" but instead whether a

plaintiff is "entitled to offer evidence to support the claims." *Sikhs for Just. v. Nath*, 893 F. Supp. 2d 598, 615 (S.D.N.Y. 2012).

At the same time, plaintiff must allege sufficient facts to "nudge[] their claims across the line from conceivable to plausible." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim is plausible when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Matson v. Bd. of Educ.*, 631 F.3d 57, 63 (2d Cir. 2011) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). Although the Court takes all factual allegations contained in the complaint as true, it does not do so for legal conclusions or "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Iqbal*, 556 U.S. at 678.

Courts are required to give special consideration to litigants who are representing themselves in court. A pro se litigant's pleadings are held "to less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus,* 551 U.S. 89, 94 (2007) (per curiam) (quoting *Estelle v. Gamble,* 429 U.S. 97, 106 (1976)). The Court "liberally construe[s] pleadings and briefs submitted by *pro se* litigants, reading such submissions to raise the strongest arguments they suggest." *McLeod v. Jewish Guild for the Blind*, 864 F.3d 154, 156 (2d Cir. 2017) (quoting *Bertin v. United States,* 478 F.3d 489, 491 (2d Cir. 2007)).

**DISCUSSION**

I.   Title VII Claims

  A.   Discrimination Claims

Title VII of the Civil Rights Act of 1964 makes it unlawful for an employer to "discharge any individual, or otherwise to discriminate against any individual with respect

to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin[.]" 42 U.S.C. § 2000e-2(a)(1). In *Littlejohn v. City of New York*, the Second Circuit Court of Appeals set out a framework for evaluating employment discrimination claims at the motion to dismiss stage. 795 F.3d 297, 306–11 (2d Cir. 2015). The Second Circuit arrived at this framework by synthesizing several relevant Supreme Court precedents, including *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973), *Swierkiewicz v. Sorema N. A.,* 534 U.S. 506 (2002), and *Ashcroft v. Iqbal,* 556 U.S. 662 (2009). *See Littlejohn*, 795 F.3d at 306–11. Under the Second Circuit's framework, for a plaintiff raising a discrimination claim via circumstantial evidence, "what must be plausibly supported by facts alleged in the complaint is that the plaintiff [(1)] is a member of a protected class, [(2)] was qualified, [(3)] suffered an adverse employment action, and [(4)] has at least minimal support for the proposition that the employer was motivated by discriminatory intent." *Id.* at 311.

With respect to the fourth element, "the plaintiff does not need substantial evidence of discriminatory intent," but rather "need only give plausible support to a minimal inference of discriminatory motivation." *Id.*; *see* also *id.* (explaining that plaintiff need only "sustain a *minimal* burden of showing facts suggesting an inference of discriminatory motivation" (emphasis in original)). However, even under this minimal burden, plaintiff must still allege sufficient allegations to "nudge [her] claims across the line from conceivable to plausible." *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 87 (2d Cir. 2015) (quoting *Twombly*, 550 U.S. at 570).

An inference of discriminatory intent can be established from, among other things, "the employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the employee's protected group; or the more

13

favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's discharge." *Leibowitz v. Cornell Univ.*, 584 F.3d 487, 502 (2d Cir. 2009). Less favorable treatment is a common line of argument. *See Ruiz v. County of Rockland,* 609 F.3d 486, 493 (2d Cir. 2010) ("A showing of disparate treatment—that is, a showing that an employer treated plaintiff less favorably than a similarly situated employee outside his protected group—is a recognized method of raising an inference of discrimination for the purposes of making out a prima facie case."). However, "a plaintiff attempting to show that the employer treated her less favorably than a similarly situated employee outside her protected group must show she was similarly situated in all material respects to the individuals with whom she seeks to compare herself." *Littlejohn*, 795 F.3d at 312 (quoting *Mandell v. County of Suffolk*, 316 F.3d 368, 379 (2d Cir. 2003)).

Plaintiff's amended complaint argues that she was subject to adverse employment actions, including her ultimate termination, on the basis of her sex and her race in violation of Title VII. Each theory is addressed below.

1.      Sex Discrimination

Plaintiff has not provided factual allegations that would permit a reasonable inference that her treatment and termination were connected to her sex. Plaintiff's amended complaint makes no mention of her sex nor any conduct by any other individual that was premised on her sex, referenced her sex, or was specific to her because of her sex. *See generally* AC. She likewise does not allege that a similarly situated employee of a different sex was treated better than her. *See generally* AC. Nor does she allege that upon being terminated, she was replaced by a person of a different sex. *See generally* AC. Although plaintiff pleads extensive and detailed facts about how she was treated poorly at

work, these facts are not sufficient to raise an inference of discrimination on the basis of sex.

As the Supreme Court has noted, "Title VII . . . does not set forth a general civility code for the American workplace." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006). "At most," defendants' actions toward plaintiff "indicate a general dislike for [plaintiff]; they are not, standing alone, objectively indicative of gender animus." *DiPizio v. Empire State Dev. Corp.,* 745 F. App'x 385, 392 (2d Cir. 2018) (summary order) (quoting *Ford v. N.Y.C. Dep't of Health & Mental Hygiene*, 545 F. Supp. 2d 377, 389 (S.D.N.Y. 2008)). Because plaintiff's amended complaint merely raises conclusory assertions of discrimination on the basis of sex, but fails to offer facts that would give rise to an inference of discriminatory motivation, plaintiff has failed to state a claim for sex discrimination under Title VII. Accordingly, the claim must be dismissed. *See Iwelu v. N.Y. State Off. of Mental Health*, No. 22-cv-03096, 2024 WL 2175938, at *3 (2d Cir. May 15, 2024) (summary order).

Yadav's comment that defendants hired plaintiff with the knowledge of "who [plaintiff is]," Tr. 12, does not change this analysis. Although plaintiff does not specifically mention this comment in her amended complaint, the transcript of the recorded meeting reveals that during the early portion of the recording, where Lhaden and Yadav are speaking only to one another, Yadav asks rhetorically, "but what is the discrimination here?" and then states, rhetorically and in reference to plaintiff, "[w]e hired you even after knowing who you are, right? We hired you. We want to give you a chance." Tr. 11–12. The statement that defendants "hired [plaintiff] even after knowing who [plaintiff] [is]" could be a reference to plaintiff's sex (or, alternatively, her age, race, or more than one characteristic). However, even assuming that these words referenced a protected

characteristic, the Court finds that this statement does not support an inference of discrimination on the basis of sex (or on the basis of any other protected characteristic). Yadav was attempting to convey her opinion that the fact that defendants chose to hire plaintiff with knowledge of plaintiff's protected characteristics is evidence that defendants are *not* discriminatory. Regardless of whether that argument would be a successful defense on the merits, the Court finds that Yadav's attempt to discuss a potential defense to accusations of racism, sexism, or agism is not, itself, support for an inference of discrimination.

2.    <u>Race Discrimination</u>

Plaintiff's amended complaint contains several references to race. The Court considers each.

First, plaintiff alleges that defendant Yadav stated, on a recording, "[l]ook at her . . . who wants to work with her?" while attempting to persuade Lhaden to echo these sentiments to Sharanya C. AC ¶ 15 (ellipses in original). The comment "[l]ook at her . . . who wants to work with her?" could potentially be construed as a statement that the speaker did not want to work with plaintiff on the basis of plaintiff's race. However, an examination of the recording shows that the unabridged quote (without ellipses) conveys a different meaning. Yadav in fact said "look at her *attitude*" and then remarked "[h]ow will I work with her?" Tr. 12 (emphasis added). The Court concludes that a reference to plaintiff's attitude, rather than plaintiff's visual appearance, without more is not evidence of race discrimination.

Second, plaintiff alleges that "Yadav explicitly stated that she would not work with [p]laintiff, declaring, 'I am going to work across the street at DHK; I am not going to work with her because she is going to be in a lawsuit.'" AC ¶ 18. Plaintiff further alleges that

16

"[t]hese actions and comments are clearly discriminatory and racist, as [d]efendant Yadav continued to work with other employees who were not African American, thereby ostracizing [p]laintiff due to racial discrimination and creating a hostile work environment." AC ¶ 17. The Court concludes that, even assuming Yadav said these words, they are not without more evidence of race discrimination. This remark does not in any way reference race or any attribute connected to race, and there is nothing about the remark that indicates it was said about plaintiff because of plaintiff's race. At most, this remark conveys a general dislike of plaintiff or a concern that plaintiff is litigious. In absence of indicia that tie this remark to plaintiff's race, plaintiff has failed to plausibly allege that this statement supports an inference of race discrimination.

Third, plaintiff alleges that she was "repeatedly harassed, yelled at, singled out, and targeted; frequently summoned to unscheduled meetings for unwarranted discipline; and assigned tedious, non-job-related clerical tasks that were not imposed on similarly situated non-African American employees." AC ¶ 10. For example, plaintiff notes that "Lhaden, who was specifically trained to perform many of the functions for which [p]laintiff was hired, was not subjected to such treatment." AC ¶ 10. Elsewhere in the amended complaint, plaintiff alleges that Lhaden is Asian. AC ¶ 7. The Court concludes that these allegations are sufficient to state a Title VII race discrimination claim that meets the plausibility threshold.

With regard to the first three elements of a prima facie case for discrimination under Title VII, plaintiff is a member of a protected class, AC ¶ 7, she alleges that she was highly qualified for employment in clinical research, AC ¶¶ 1–2, and there is little doubt that being "repeatedly harassed, yelled at, [given] unwarranted discipline[,] and assigned tedious, non-job-related clerical tasks" could constitute an adverse employment action,

17

*see, e.g., Little v. Nat'l Broad. Co.,* 210 F. Supp. 2d 330, 387 (S.D.N.Y. 2002) ("[U]nwarranted disciplinary letters[] could constitute an adverse employment action."); *Bowen-Hooks v. City of New York*, 13 F. Supp. 3d 179, 214 (E.D.N.Y. 2014) ("[D]elegation of secretarial tasks below or outside an employee's job description has been found to constitute an adverse employment action."). With respect to the fourth element, discriminatory intent, plaintiff can satisfy her "minimal burden," *Littlejohn*, 795 F.3d at 311, by plausibly alleging "that an employer treated plaintiff less favorably than a similarly situated employee outside [her] protected group," *Ruiz,* 609 F.3d at 493. Plaintiff has met this burden by pleading that "similarly situated non-African American employees" were not subject to the same treatment and giving the specific example of defendants' treatment of Lhaden. AC ¶ 10. At this preliminary stage of litigation, plaintiff's plausible allegations concerning differential treatment are sufficient to state a Title VII race discrimination claim.

Fourth and finally, plaintiff alleges that staff held secret meetings held at the office as soon as she left for lunch, which were attended by Yadav, Sharanya C., Lhaden, and Dr. Nagar. AC ¶ 7. Plaintiff alleges that these meetings "included only the Asian members of the clinical trial team along with Dr. Nagar," and that her "exclusion was a discriminatory and racist practice against [p]laintiff, an African American, as she was the key person in the clinical trials department but was omitted from [these] meetings." AC ¶ 7. However, this conduct does not constitute an adverse employment action. *See Littlejohn*, 795 F.3d at 312 n.10 ("To the extent [the plaintiff] attempts to point to exclusion from meetings . . . as part of her disparate treatment claim, such exclusion does not constitute an adverse employment action within the meaning of Title VII."); *see also Betterson v. HSBC Bank USA, N.A.*, 661 F. App'x 87, 90 (2d Cir. 2016) (summary order) ("Exclusion from certain

18

meetings is not an adverse employment action."). The Court thus concludes that the fact that plaintiff's team held secret meetings that excluded her is not, without more, sufficient to articulate a plausible race discrimination claim under Title VII.

> ### B.     Hostile Work Environment Claim

To state a hostile work environment claim under Title VII, "a plaintiff must plead facts that would tend to show that the complained of conduct: (1) is objectively severe or pervasive—that is, creates an environment that a reasonable person would find hostile or abusive; (2) creates an environment that the plaintiff subjectively perceives as hostile or abusive; and (3) creates such an environment because of the plaintiff's [protected characteristic]." *Patane v. Clark*, 508 F.3d 106, 113 (2d Cir. 2007).

The Court considers whether "the workplace was permeated with discriminatory intimidation, ridicule, and insult that altered the conditions of the victim's employment and created an abusive working environment." *Choudhury v. Northwell Health, Inc.*, No. 23-cv-01406, 2025 WL 2300220, at *8 (E.D.N.Y. Aug. 8, 2025) (quoting *Harris v. NYC Hum. Res. Admin.*, No. 20-cv-02011, 2021 WL 3855239, at *9 (S.D.N.Y. Aug. 27, 2021)). "To make this determination, courts must consider all the circumstances, including the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* (quoting *Harris*, 2021 WL 3855239, at *9). For the conduct to qualify as pervasive, the "incidents must be more than episodic and instead must be sufficiently continuous and concerted." *Id.* (quoting *Feingold v. New York*, 366 F.3d 138, 150 (2d Cir. 2004)). A single incident can create a hostile work environment only if "it is so severe that it results in a transformation of the plaintiff's workplace based on the plaintiff's protected characteristics." *Id.* (quoting *Feingold*, 366

19

F.3d at 150). Moreover, to establish a hostile work environment claim, "[i]t is axiomatic that the plaintiff . . . must show that the hostile conduct occurred because of a protected characteristic." *Tolbert v. Smith*, 790 F.3d 427, 439 (2d Cir. 2015); *see also Iwelu*, 2024 WL 2175938, at *4 ("Title VII does not prohibit all verbal or physical harassment in the workplace, only discrimination on a protected ground." (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998)); *Choudhury*, 2025 WL 2300220, at *8–9.

The Court finds that plaintiff has failed to plead a Title VII hostile work environment claim because all of the specific conduct that plaintiff complains of is neutral on its face and plaintiff has not sufficiently connected this conduct with her race or sex. Plaintiff's allegations include: (1) that Lhaden's request to not work with plaintiff was granted, AC ¶¶ 3, 15; (2) that plaintiff was wrongfully blamed for scientific protocol errors that were not her fault, AC ¶ 5; (3) that Yadav stated that she did not want to work with plaintiff, AC ¶ 17; (4) that Yadav and Lhaden said negative things about plaintiff, including criticizing her work performance, worrying that she was planning to bring a lawsuit, calling her "trouble," noting that defendants hired plaintiff knowing "who [plaintiff is]," and complaining about plaintiff's attitude, *see generally* Tr.; (5) that plaintiff was called into baseless, unscheduled meetings, during which time she was unreasonably questioned and unfairly criticized, AC ¶¶ 4–5, 10–11; (6) that Yadav falsely alleged that plaintiff accepted her position solely for healthcare benefits and inappropriately inquired into plaintiff's personal details, AC ¶ 6; (7) that plaintiff was intentionally excluded from meetings, AC ¶ 7; (8) that plaintiff was subject to "critical emails about her work performance, unscheduled prolonged meetings, and coerced participation in recorded Zoom calls intended to intimidate her," AC ¶ 11; (9) that Dr. Formenti questioned how long plaintiff would last, referencing the department's high turnover rate; and (10) that plaintiff was

20

"was repeatedly harassed, yelled at, singled out, and targeted; frequently summoned to unscheduled meetings for unwarranted discipline; and assigned tedious, non-job-related clerical tasks," AC ¶ 10. Significantly, none of this conduct is on its face related to plaintiff's race or sex.

"No matter how genuinely upsetting or unfair they may be, actions that are unconnected to a plaintiff's protected characteristics cannot support a hostile work environment claim under Title VII." *Choudhury*, 2025 WL 2300220, at *8 (citing *Vito v. Bausch & Lomb Inc.*, 403 F. App'x 593, 595 (2d Cir. 2010)); *see also Vito*, 403 F. App'x at 595 ("It is axiomatic that in order to establish a hostile work environment a plaintiff must demonstrate that the conduct occurred because of [his] membership in a protected class."); *Johnson v. City Univ. of N.Y.*, 48 F. Supp. 3d 572, 574 (S.D.N.Y. 2014) ("Bullying and harassment have no place in the workplace, but unless they are motivated by the victim's membership in a protected class, they do not provide the basis for an action under Title VII."). Actions such as "undermining plaintiff in front of direct reports, excluding plaintiff from meetings, taking away plaintiff's work duties, and making negative comments about plaintiff's career advancement" have been found insufficient to "support a Title VII hostile work environment claim [where] plaintiff failed to connect the racially-neutral conduct to" any race-based incident. *Choudhury*, 2025 WL 2300220, at *8 (discussing *Hughes v. Xerox Corp.*, 37 F. Supp. 3d 629 (W.D.N.Y. 2014)); *see also McMillian v. N.Y.C. Taxi & Limousine Comm'n*, No. 20-cv-05722, 2022 WL 4539689, at *1 (E.D.N.Y. Sept. 28, 2022) ("Plaintiff's hostile work environment claim [is] dismissed because Plaintiff does not provide any concrete examples of how such conduct was tied to his gender.").

Accepting all the non-conclusory factual allegations in plaintiff's complaint as true, the Court finds that plaintiff has not pled a valid hostile work environment claim under Title VII. Although conduct that is facially neutral with respect to race or gender "can be considered in assessing the totality of the circumstances for a hostile work environment claim, there must be some circumstantial or other basis for inferring that such incidents were in fact discriminatory." *Hughes*, 37 F. Supp. 3d at 647. Plaintiff has not provided such a basis, and accordingly, her hostile work environment claim must be dismissed.

C.      Retaliation Claim

Plaintiff's retaliation claim under Title VII is reviewed under a "relaxed" version of the *McDonnell Douglas* burden-shifting framework. *McFarlane v. Cmty. Health Ctr. of Richmond, Inc.*, No. 25-cv-00410, 2025 WL 3625900, at *8 (E.D.N.Y. Dec. 15, 2025) (citing *Littlejohn*, 795 F.3d at 307). "In order to survive a motion to dismiss, plaintiff must plausibly allege that: (1) defendant discriminated—or took an adverse employment action—against plaintiff, (2) because plaintiff has opposed any unlawful employment practice." *Id.* (quoting *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 90 (2d Cir. 2015)). "To satisfy the requirement that plaintiff engaged in protected activity by opposing an employer's practice, plaintiff need only allege a good faith, reasonable belief that the underlying employment practice was unlawful, whether or not it actually was unlawful." *Id.* (quoting *Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d Cir. 2013)).

With respect to the second prong, the plaintiff must establish that the protected activity was a "but-for" cause of the retaliatory conduct—in other words, "that the adverse action would not have occurred in the absence of the retaliatory motive." *Id.* (quoting *Vega,* 801 F.3d at 90–91). "Causation can be supported at the pleading stage with allegations of (i) direct evidence of retaliatory animus or (ii) indirect evidence of causation

through temporal proximity to the protected activity or a backdrop of continuing antagonism and frustration of professional ambitions." *Id.* (quoting *Duplan v. City of New York*, 888 F.3d 612, 625–26 (2d Cir. 2018)). The temporal proximity route requires "showing that the protected activity was closely followed in time by the adverse employment action." *Tafolla v. Heilig*, 80 F.4th 111, 125–26 (2d Cir. 2023). "While [the Second Circuit] has not drawn a bright line defining the outer limits beyond which a temporal relationship is too attenuated to establish causation, [the Second Circuit has] previously held that a period of several months can demonstrate a causal connection between the protected activity and the alleged adverse action." *Banks v. Gen. Motors, LLC*, 81 F.4th 242, 277 (2d Cir. 2023).

"Finally, plaintiff must also allege that she was subjected to a retaliatory action, or a series of retaliatory actions, that were materially adverse." *McFarlane*, 2025 WL 3625900, at *8 (quoting *Carr v. N.Y.C. Transit Auth.*, 76 F.4th 172, 180 (2d Cir. 2023)). An action qualifies as adverse "if it well might have dissuaded a reasonable worker from making or supporting a charge of unlawful activity, as defined in the underlying statute, against her employer." *Id.* (quoting *Carr*, 76 F.4th at 180). "Whether an employer's action is adverse is often a heavily fact-specific, contextual determination." *Id.* (quoting *Connelly v. County of Rockland,* 61 F.4th 322, 325 (2d Cir. 2023)).

With respect to the protected activity element, plaintiff's amended complaint identifies at least three specific examples of activity that plausibly constitutes opposing an employment practice that plaintiff believes is unlawful: (1) submitting a complaint by email around October 4, 2023, to which Dr. Formenti responded, AC ¶ 13; (2) submitting a complaint to Weill Cornell's Office of Institutional Equity at some point on or after October 4, 2023, AC ¶ 13; and (3) submitting a complaint to the New York State Division

23

of Human Rights, *see* Compl. 29–32. Each of these actions constitute participation in a protected activity.

With respect to the adverse employment action element, plaintiff identifies at least three examples of adverse employment actions that she faced: (1) being "repeatedly harassed, yelled at, singled out, and targeted; frequently summoned to unscheduled meetings for unwarranted discipline; and assigned tedious, non-job-related clerical tasks," AC ¶ 10, insofar as these actions occurred subsequent in time to the plaintiff's protected activity; (2) having her approved medical leave cancelled at the last minute on October 12, 2023 by Sharanya C., AC ¶ 13; and (3) being terminated by Weill Cornell on August 8, 2024, AC ¶ 18. Each of these actions, if true, would constitute an adverse employment action.

Finally, the Court concludes that plaintiff has pled facts that make it plausible to believe that she suffered adverse employment actions "because" of her protected activity. *Vega*, 801 F.3d at 90–91. At the motion to dismiss stage, it is sufficient to show "temporal proximity" between the protected activity and the adverse employment action. *Duplan*, 888 F.3d at 625–26. Plaintiff's first formal complaint occurred around October 4, 2023, AC ¶ 13, and her further formal complaints seemingly occurred within days or weeks of this initial complaint. Plaintiff's medical leave set for October 12, 2023 was abruptly cancelled shortly before it was set to begin, and the fact that this occurred only days after her initial complaint is sufficient "temporal proximity." *Duplan*, 888 F.3d at 625–26. Moreover, although plaintiff was not terminated until August 2024, she had been on long-term medical leave for eight months prior to her termination, and defendants concede that the decision to terminate her was actually made much earlier. Specifically, defendants concede that "the [Weill Cornell Radiation Oncology] Department requested [p]laintiff's

termination before the end of her six-month probationary period, in late 2023, based on her poor work performance and interpersonal issues." Mot. 16 n.3. Defendants further explain that "[t]he termination process was on hold during [p]laintiff's medical leave until [p]laintiff confirmed in August 2024 that she did not wish to apply for long-term disability benefits." Mot. 16 n.3. The time period between October 4, 2023, when plaintiff's protected activity began, and "late 2023," when plaintiff's department requested her termination, is well within the period that the Second Circuit has recognized is short enough for temporal proximity. *Banks*, 81 F.4th at 277 (noting that "a period of several months" can still demonstrate a causal connection). Finally, plaintiff alleges that in the course of her employment, she was "yelled at, singled out, and targeted; frequently summoned to unscheduled meetings for unwarranted discipline; and assigned tedious, non-job-related clerical tasks," but plaintiff does not clearly delineate what specific instances of these events happened after October 4, 2023. Nevertheless, particularly in light of the Court's obligation to construe pro se pleadings liberally, *McLeod*, 864 F.3d at 156, the Court finds that it is plausible to believe based on the complaint that some of this activity occurred between October 4, 2023 and the date in late 2023 or early 2024 when plaintiff went out on medical leave. In sum, the Court finds that plaintiff has plausibly articulated a claim for retaliation by defendant Weill Cornell under Title VII.

The Court reaches the same conclusion with respect to the retaliation claim against defendant Yadav. Although the amended complaint does not clearly explain what role, if any, Yadav had in (1) the cancellation of plaintiff's approved October 12, 2023 medical leave, (2) plaintiff's termination, or (3) the alleged workplace mistreatment that occurred after October 4, 2023, the Court finds that it is plausible that Yadav—as plaintiff's direct supervisor—had a role in each of these adverse employment actions. Moreover, the

complaint incorporates by reference a recording where Yadav can be heard saying: "What is bothering me is not incompetence. What is bothering me is the litigation and the legal things that she's bringing here. . . . And I mean, . . . I've worked very hard to be where I am. I do not want to get drawn into something, like, so bad." Tr. 5. The Court concludes that Yadav's statement that she is "bother[ed]" by "the legal things that [plaintiff is] bringing here" could plausibly be a statement that Yadav held animus toward plaintiff on the basis of protected activity. Therefore, the Court finds that plaintiff has likewise articulated a Title VII claim for retaliation against Yadav.

## II.     Age Discrimination in Employment Act

Plaintiff's claim for age discrimination under the ADEA must be dismissed against defendant Yadav because there is no individual liability under the ADEA. *See Iwelu*, 2024 WL 2175938, at *2 n.5.

Plaintiff's claim for age discrimination under the ADEA must also be dismissed against defendant Weill Cornell because plaintiff has not pled facts rendering it plausible that plaintiff's age was the reason she was terminated. "[T]o defeat a motion to dismiss . . . , an ADEA plaintiff must plausibly allege that [s]he would not have been terminated but for h[er] age." *Lively v. WAFRA Inv. Advisory Grp., Inc.*, 6 F.4th 293, 303 (2d Cir. 2021). In the present case, plaintiff's amended complaint does not allege that she would not have been terminated but for her age. Moreover, aside from a single, tangentially-related question about the age of plaintiff's son, AC ¶ 6, the amended complaint makes no mention of plaintiff's age nor any conduct by any other individual that was premised on her age, referenced her age, or was specific to her because of her age. *See generally* AC.

The only time that plaintiff's age is referenced occurs in a portion of the audio recording not discussed by plaintiff, where Lhaden and Yadav are speaking to one another,

and Lhaden states "I thought she (inaudible) age difference between us or I thought she was (inaudible), but she has a lot of feelings about (inaudible), you know." Tr. 12. Yadav responds "[b]ut you have to, like, (inaudible), right? . . . When I came to clinical research, I was a little bit older, because I completed my Ph.D[.] and stuff like that." Tr. 12. Lhaden then replies, "Yes -- no, I mean, you were treated differently, because of --," Yadav then cuts in, "Yes. You and me are very easily, I think, even 20 years apart." Tr. 13. Although deficiencies in the recording make it impossible to fully understand what Yadav and Lhaden were communicating to one another, the Court finds that there is no plausible way to interpret these remarks as evidence that plaintiff would not have been terminated but for her age.

III.     NYSHRL and NYCHRL

A document appended to the original federal court complaint suggests that, at some point, plaintiff submitted a complaint regarding some of her treatment by defendants to the New York State Division of Human Rights ("NYSDHR"). S*ee* Compl. 29–32. Under the election of remedies doctrine, "[g]enerally, the remedies of administrative review through the Human Rights Division or judicial review are mutually exclusive" *Moodie v. Fed. Reserve Bank of N.Y.*, 58 F.3d 879, 882–83 (2d Cir. 1995) (quoting *Pan Am. World Airways v. N.Y. State Hum. Rts. Appeal Bd.*, 61 N.Y.2d 542, 548 (1984)). "The election of remedies bar is jurisdictional." *Williams v. City of New York*, 916 F. Supp. 2d 517, 521 (S.D.N.Y. 2013) (quoting *Higgins v. NYP Holdings, Inc.*, 836 F. Supp. 2d 182, 187 (S.D.N.Y. 2011)). Moreover, the bar precludes consideration of any events "arising out of the same incident" or "based on the same operative events" as those reported to the NYSDHR. *Id.* (quoting *Higgins*, 836 F. Supp. 2d at 188–89). Because it is not clear when the NYSDHR complaint was submitted or what events it covered, the Court will order

27

plaintiff to show cause why her NYSHRL and NYCHRL claims should not be dismissed. Specifically, plaintiff must file a letter explaining: (1) what conduct she complained of to the NYSDHR; and (2) what the outcome was of her complaint(s). Plaintiff is encouraged to attach documentation to her letter, such as copies of the information she submitted to the NYSDHR. Plaintiff may also include in her letter arguments about why her NYSHRL and NYCHRL claims should not be dismissed due to the election of remedies doctrine. Plaintiff shall file the letter and any attached materials on or before March 30, 2026. Defendants may file a response within fourteen (14) days of service of plaintiff's letter. Plaintiff's letter and defendants' response shall not exceed three (3) pages each, excluding attachments.

IV. Remaining Claims

Plaintiff's state law claim for defamation must be dismissed because the conduct the claim is based on constitutes "opinion or rhetorical hyperbole," which is not a sufficient basis for defamation under New York law. *See Bowen v. Van Bramer*, 168 N.Y.S.3d 107, 109 (App. Div. 2022). Plaintiff's defamation claim is based on Yadav's statement that "no one wants to work with [plaintiff]." AC ¶ 35. Similar statements have been widely found to constitute non-actionable "opinion or rhetorical hyperbole" under New York law. *See, e.g.*, *Williams v. Varig Brazilian Airlines,* 564 N.Y.S.2d 328, 329, 331 (App. Div. 1991) (holding that supervisor's comments regarding plaintiff that "her disposition and her attitude" make her "very difficult to work with" constituted nonactionable expression of opinion); *Varughese v. Mount Sinai Med. Ctr.*, No. 12-cv-08812, 2015 WL 1499618, at *74 (S.D.N.Y. Mar. 27, 2015) (holding that characterizations of plaintiff's work as "unsatisfactory" "unprofessional" and "substandard" were nonactionable opinion), *aff'd*, 693 F. App'x 41 (2d Cir. 2017). Accordingly, plaintiff has not stated a plausible claim for defamation.

Plaintiff's state law claim for intentional infliction of emotional distress must be dismissed because the conduct the claim is based on falls short of the extraordinarily high bar for IIED claims. Under New York law, the elements of an IIED claim are "(1) extreme and outrageous conduct, (2) intent to cause severe emotional distress, (3) a causal connection between the conduct and the injury, and (4) severe emotional distress." *Semper v. N.Y. Methodist Hosp.*, 786 F. Supp. 2d 566, 586 (E.D.N.Y. 2011) (quoting *Bender v. City of New York,* 78 F.3d 787, 790 (2d Cir. 1996)). The conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.* Plaintiff's IIED claim, like her defamation claim, is premised on Yadav's statement that "no one wants to work with [plaintiff]." AC ¶ 35. This statement is not sufficiently outrageous to satisfy the first element of an IIED claim, and accordingly, plaintiff's IIED claim must be dismissed.

Finally, plaintiff's claim for "Violation of FDA Regulations and Clinical Trial Protocols," AC ¶¶ 40–42, must be dismissed because plaintiff has not identified a private right of action entitling her to sue defendants for "failure to adhere to FDA-mandated protocols" AC ¶ 41. Indeed, "there is no private right of action to enforce FDA regulations." *Warren v. Stop & Shop Supermarket, LLC*, 592 F. Supp. 3d 268, 280 n.2 (S.D.N.Y. 2022) (citing *PDK Labs, Inc. v. Friedlander*, 103 F.3d 1105, 1113 (2d Cir. 1997)); *see also Frei v. Taro Pharms. U.S.A., Inc.*, 443 F. Supp. 3d 456, 468 (S.D.N.Y. 2020) ("[T]he FDCA does not provide a private right of action for a defendant's violation of its provisions. (citing *Merrell Dow Pharm. Inc. v. Thompson*, 478 U.S. 804, 810 (1986))).

## CONCLUSION

For the foregoing reasons, defendants' motion to dismiss is **DENIED** with respect to plaintiff's Title VII retaliation and race discrimination claims. Defendants' motion to dismiss is **GRANTED** with respect to all remaining claims raised in plaintiff's amended complaint aside from plaintiff's NYCHRL and NYSHRL claims.

Plaintiff is ordered to show cause why her NYSHRL and NYCHRL claims should not be dismissed due to the election of remedies doctrine. Specifically, plaintiff must file a letter explaining: (1) what conduct she complained of to the NYSDHR; and (2) what the outcome was of her complaint(s). Plaintiff is encouraged to attach documentation to her letter, such as copies of the information she submitted to the NYSDHR. Plaintiff may also include in her letter arguments about why her NYSHRL and NYCHRL claims should not be dismissed due to the election of remedies doctrine. Plaintiff shall file the letter and any attached materials on or before March 30, 2026. Defendants may file a response within fourteen (14) days of service of plaintiff's letter. Plaintiff's letter and defendants' response shall not exceed three (3) pages each, excluding attachments.

The case is respectfully referred to the magistrate judge for pretrial supervision.

**SO ORDERED.**

　　　　　　　　　　　　　　　　　　　　　　　_/s/ Natasha C. Merle_
　　　　　　　　　　　　　　　　　　　　　　　NATASHA C. MERLE
　　　　　　　　　　　　　　　　　　　　　　　United States District Judge

Dated:　　　　March 16, 2026
　　　　　　　　Brooklyn, New York

30